```
United States of America,    )
                             )
           Plaintiff,        )
                             )
     v.                      )
                             )          No. CR—08-0233 DLJ
Ethan Berry,                 )
                             )          ORDER
           Defendant.        )
_____)
```

On April 24, 2009, defendant Ethan Berry (Berry) filed a motion to dismiss the sole count of the indictment. On June 12, 2009 this Court held a hearing on the matter. Attorney Stephen Corrigan appeared on behalf of the United States and defendant was represented by Attorney Patrick Robbins. Having reviewed the papers and having heard oral argument on this matter, the Court finds the following.

I.  BACKGROUND

Defendant is charged with Social Security representative fraud in violation of 42 U.S.C. § 408(5)(a). The indictment alleges that between May 2005 through November 2006, Berry unlawfully obtained and converted for his own use $53,541 in federal funds that were designated for the benefit of his minor son.

On October 10, 1997, Kim Walker gave birth to a son named Drew, fathered by Ethan Berry. Over the course of Drew's life Walker and Berry have been involved in a contentious custody dispute in Contra Costa County Superior Court.

In July of 1999, Berry was in an automobile accident, which led to a serious back condition. In March of 2000, Berry

applied for Social Security disability benefits. The Social Security Administration (SSA) initially denied his application, finding that he was not disabled under the Act. Berry appealed, and the case was remanded and reassigned to an Administrative Law Judge. Before that judge ruled on Berry's remanded disability claim, a family law judge in the Superior Court of California entered an order for Berry to pay child support. Berry currently owes approximately $114,749 in child support dating back to April 18, 2001.

On March 22, 2005, the administrative law judge found that Berry had been disabled in 1999 and authorized Berry to receive disability insurance benefits dating back to March 2000, the date of his application. The family law court has not made any changes to the standing child support order.

Shortly after receiving his disability benefits, Berry applied for social security benefits for his minor son Drew, which Drew was eligible to receive because he has a disabled father. The SSA approved the application and awarded the benefits to Drew and designated Berry as Drew Berry's representative payee, sending the money to Berry in trust for his child.

On July 18, 2005, SSA issued Berry a retroactive benefit check for Drew Berry in the amount of $42,086, for benefits dating back to March 2000 (the date of Berry's application for disability benefits). The SSA subsequently mailed monthly benefits checks to Berry for his son Drew, and continued to do so until October 2006.

2

The government contends that the cancelled checks Berry received on his son's behalf from July 2005 to November 2006 show that he deposited all the checks into an account at Wells Fargo Bank, except for one check that was deposited into an account at Scottrade, Inc. The Wells Fargo account into which most of the checks were deposited is a business account opened by Berry's sister Diane Thomas on August 23, 2005. Ethan Berry was added as co-signatory on September 16, 2005. The name on the account, as well as on the checks, is "Partner Database," with an address of 484 Lake Park Avenue, Suite 160, in Oakland, which is a commercial mail drop facility.

On the same day that Berry was added as a co-signatory, September 16, 2005, he deposited Drew's check issued by the social security administration for $42,086. Six days later, on September 22, 2005, Diane Thomas withdrew $41,500. The account was used to pay various expenses and Berry's credit card bills.

On April 9, 2008, the Grand Jury returned an indictment charging Berry with social security representative fraud in violation of 42 U.S.C. § 408(a)(5). Specifically, the indictment alleges that between May 2005 and November 2006, "having made application to receive payment under Title 42, Chapter 7, Subchapter II for the use and benefit of another, namely, his minor son, and having received such payment, namely approximately $53,541 in Child Insurance Benefit payments," Berry "did knowingly and willfully convert such payment, and any part of such payment, to a use other that for the use and benefit of such other person."

II. LEGAL STANDARD

In considering a pretrial motion to dismiss an indictment, the court "must presume the truth of the allegations in the charging instruments." United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996). In deciding a motion to dismiss under Federal Rule of Criminal Procedure 12(b), a court can "make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986)(internal quotation omitted).

A court may base its decision on undisputed facts without fear of invading the province of the jury. See United States v. Flores, 404 F.3d 320, 325 (5th Cir. 2005) ("dismissing an indictment based on the resolution of a legal question in the presence of undisputed facts is authorized by the Federal Rules of Criminal Procedure"). For purposes of this motion only, Berry has asked the Court to assume that the relevant factual allegations in the government's Indictment and Trial Memorandum are undisputed.

III. DISCUSSION

Defendant asserts that the Indictment should be dismissed on due process grounds because he did not have fair notice that his conduct was potentially criminal. "The underlying principle is that no man shall be held criminally responsible

4

for conduct which he could not reasonably understand to be proscribed." United States v. Harris, 347 U.S. 612, 617 (1954.; see also Parachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972).

"The constitutional requirement of definiteness is violated when a criminal statute fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." United States v. Harris, 347 U.S. 612, 617 (1954); see also Alcaraz v. Block, 746 F.2d 593, 609 (9th Cir. 1984) ("This court's test in constitutional vagueness challenges to administrative regulations is whether the regulation gives a person of ordinary intelligence fair notice of what is required" (internal quotation omitted)).

A. Could a reasonable person have known the acts alleged in the indictment were illegal?

Defendant argues that a statute may be void if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."

Defendant argues that the statutory language regarding representative payees is "overly vague" as it is "highly generalized and aspirational." As evidence, defendant cites to code sections relating to the choice of representative payees. See 42 U.S.C. Section 405(j) (The Commissioner of Social Security must find "adequate evidence" that certification of the individual as a representative payee would be "in the

5

interest of" the beneficiary. § 405(j)(2)(A). However these sections are not at issue in this case. The indictment does not assert that Berry's application was fraudulent, rather, the indictment alleges that Berry converted the payments he received on behalf of his son Drew for a purpose other than their intended purpose.

Once certified as a representative payee, as Berry was, an individual undertakes to accept payments for the "use and benefit" of the beneficiary. 42 U.S.C. § 405(j)(1)(A). Defendant asserts that the term "use and benefit" is undefined and therefore too vague to enforce. He also argues that the term "misuse" is insufficiently clear. Section 405(j)(9) defines "misuse" as "any case in which the representative payee receives payment . . . for the use and benefit of another person and converts such payment, or any part thereof, to a use other than for the use and benefit of such other person."

Section 408(a)(5) criminalizes "knowingly and willfully convert[ing] such a payment, or any part thereof, to a use other than for the use and benefit of such other person." While neither Section 405 nor Section 408 provide an exact definition of the term "use and benefit", defining this term has been left to the Commissioner of Social Security. Section 405(j)(9).

The Commissioner has enacted three regulations on point: 20 C.F.R. Section 404.2035 ("What are the responsibilities of your representative payee?"); Section 404.2040 ("Use of benefit payments"); and Section 404.2045 ("Conservation and investment

6

of benefit payments"). While defendant claims that these do not provide "meaningful delineation of appropriate or inappropriate expenditures" there is certainly relevant guidance here.

Section 404.2035, entitled "What are the responsibilities of your representative payee?" provides in pertinent part that:

1. A representative payee has a responsibility to--
(a) Use the benefits received on your behalf only for your use and benefit in a manner and for the purposes he or she determines, under the guidelines in this subpart, to be in your best interests;

(b) Keep any benefits received on your behalf separate from his or her own funds and show your ownership of these benefits unless he or she is your spouse or natural or adoptive parent or stepparent and lives in the same household with you or is a State or local government agency for whom we have granted an exception to this requirement;

Section § 404.2040, entitled "Use of benefit payments," provides, in pertinent part:

(a) Current maintenance.

(1) We will consider that payments we certify to a representative payee have been used for the use and benefit of the beneficiary if they are used for the beneficiary's current maintenance. Current maintenance includes cost incurred in obtaining food, shelter, clothing, medical care, and personal comfort items.

Finally, Section 404.2045, "Conservation and investment of benefit payments," sets out:

(a) General. After the representative payee has used benefit payments consistent with the guidelines in this subpart (see § 404.2040 regarding use of benefits), any remaining amount shall be conserved or invested on behalf of the beneficiary. Conserved funds should be invested in accordance with the rules followed by trustees. Any investment must show clearly that the payee holds the property in trust for the beneficiary.

The Court finds that a reasonable person reading these

7

Case 4:08-cr-00233-YGR   Document 92   Filed 07/01/09   Page 8 of 13

sections would have sufficient guidance as to the parameters of how the money could be spent. Here the allegation is that Berry did not use any of the funds for food, shelter, medical expenses or other items which benefitted his son.  Nor did Berry allegedly follow the guidance provided here as to conservation of any unspent funds in an appropriate bank account.  Moreover, the government alleges that Berry placed the funds in accounts where the beneficiary could have no access, and once to an account to which even Berry himself had no access.  A jury could find that such actions, if true, could constitute a "knowing and willful conversion" of benefit payments.

Even assuming that there is a question as to whether the statutes and regulations are not sufficiently clear, the Social Security Administration publishes a "Guide for Representative Payees," which is written in plain English and which sets out parameters for the use of funds sent to a representative payee. Currently the record is unclear on how this document is made available and whether defendant was in possession of a copy. However, if a representative payee had concerns about what expenditures were permissible and which were not, this Guide provides pertinent information.

Relevant information from that Guide includes:

Helping You Manage Your New Responsibility:

As a representative payee, you must keep informed about the beneficiary's needs so you can decide how benefits can best be used for his or her personal care and well-being.  This is especially important if the beneficiary doesn't live with you.

8

If there's money left after you've met the beneficiary's current and expected needs, it must be saved and maintained for the beneficiary. Periodically, Social Security will ask you to complete a form that accounts for the funds you've received....

Remember, representative payees are required by law to use the benefits properly, if a payee misuses benefits, he or she must repay the misused funds to the beneficiary. A payee who is convicted of misusing funds maybe be fined and/or imprisoned.

Guide pgs. 1-2

Not only does the Guide warn the recipient about the perils of misuse of funds, it goes on to provide a hierarchy of how the benefits should be used, in the following section.

How You Must Use the Benefits:

First, you must make sure the beneficiary's day-to-day needs for food and shelter are met. Benefits may then be used for the beneficiary's personal needs such as clothing, recreation and other expenses. Benefits can then be used to pay for medical needs (for example, eyeglasses and hearing aids and dental care that are not covered by the beneficiary's health insurance, Medicare, Medicaid or supplied by an institution where he or she resides. Or, it may be saved on his or her behalf.

Guide, at p.2.

Defendant has focused his argument on the thesis that Berry did not have sufficient guidance as to how the large lump-sum payment he received could have been spent and whether he could use it to reimburse his prior expenditures made allegedly on behalf of his son. In adopting this focus, defendant concedes, as he must, that his argument does not apply to the non-lump sum payments he received each month based upon the approval of his application. There is no question as to whether or not a reasonable person would have known that

9

these monthly payments must be spent for the use and benefit of the child, and that they cannot be used for the personal benefit of the recipient.

The Guide does provide information on the topic of lump sum payments.

How to Handle Large Sums of Money:

Sometimes a Social Security or SSI beneficiary receives **a large payment covering several months, or even years**, of benefits. If this happens, it's important that you make plans to spend the money wisely. The main thing is to keep in mind that the money must be used in the beneficiary's best interest.

Guide at. P.3. (Emphasis added)

In this case, defendant indicates that since the payment was retroactive he deemed it a reimbursement for past expenditures. Defendant's Motion at 9:4-16. This section of the Guide about "Large Sums of Money" does address lump sum back payments. The Guide specifically states, "[i]f you're not sure whether an expenditure is proper (*for example, paying a bill the beneficiary owed before you became payee)*, contact the Social Security office before you fulfill such obligations. Id. (Emphasis added). The Court finds that a reasonable person could know either what the boundaries of correct expenditures would be, or that in the case of uncertainty, that the representative payee was to check with the SSA for assistance.

The import of this Guide is that it provides information on: (1) how money should be spent to benefit the minor; (2) how to handle lump sum payments; (3) limits on representative payee

10

and third party access to bank accounts; (4) that failure to follow the instructions in the Guide can lead to criminal penalties; and (5) that the SSA is available to answer any questions.  Even if one were to accept that the statute or regulations are ambiguous, this document sets out in layman's language what the expectations are for representative payees and the repercussions of failure to follow those expectations.

Defendant argues that there is "no authority for the application of Section 408(a)(5) to the conversion of a retroactive payment, and as such prosecuting Berry would be a novel interpretation of the law violative of due process.

As noted above, this section provides that there are penalties for "[w]hoever . . having made application to receive payment under this subchapter for the use and benefit of another and having received such a payment, knowingly and willfully converts such a payment, or any part thereof, to a use other than for the use and benefit of such other person. Retroactive payments are not exempted from this language, and as noted above, are plainly addressed in the Guide.

Defendant argues that the Government is attempting to apply a novel construction of the law to Berry, as it relates to use of retroactive payments.  This does not appear to be the case.  In at least one case cited by the government, a defendant was convicted of misuse of a retroactive benefit check to purchase a vehicle for her own personal use.  U.S. v. Potwin, 166 F.3d 1202 (2nd Cir. 1998)(unpublished).  Although this is an unpublished decision, it still demonstrates that the

11

indictment is not a novel legal theory. The other cases cited by the government are less helpful since the defendant pled in each and therefore the facts of the cases are not set out in great detail. See, <u>U.S. v. Huffine</u>, 290 Fed. Appx. 48 (9th Cir. 2008); <u>U.S. v. Hogue</u>, 117 Fed Appx. 704 (10th Cir. 2004); <u>U.S. Almquist</u>, 104 Fed. Appx. 611 (8th Cir. 2004). The government cites <u>Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler</u>, 537 U.S. 371, for the proposition that misuse of retroactive back payments by representative payees is the basis for criminal liability. This concept does appear in dicta, however the Supreme Court looked ultimately at liability of the State under a different section of the Social Security Act, § 407.

B. <u>Does the Rule of Lenity Apply</u>?

The rule of lenity requires that the courts strictly construe ambiguous criminal statutes "so as to apply . . . only to conduct clearly covered." <u>United States v. Lanier</u>, 520 U.S. 259, 266 (1997). Here, again, defendant's argument can only be directed to the lump sum payments. As to the month to month payments, the allegations of the Indictment, that Berry's conduct violates the statute, do not raise any issues of vagueness, ambiguity, or lenity. The remaining question is whether adding lenity to the mix of defendant's arguments as to the lump sum payments affects Berry's motion. The Court does not believe so.

At this point the Court recognizes that Berry's original

12

motion to dismiss the Indictment must be denied. As to the month to month payments, there is no reason suggested that would require a dismissal of those charges. Even though it is also true that the Indictment will not be dismissed, the Court has considered whether a separate order removing the lump sum payments from presentation to the Jury would be proper at the pre-trial stage. For all the reasons discussed, the Court finds that it has not been shown that a lump sum payment could never support a violation of the statute requiring dismissal. The fact that it may be an outcome of a trial that Berry's actions are not shown to be a knowing violation of the statute does not mean the Indictment must be dismissed.

Accordingly the Motion to Dismiss the Indictment is DENIED.

IT IS SO ORDERED

Dated: July 1,_2009

D. Lowell Jensen
United States District Judge

13